IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| ROBERT D. BOYDSTUN, IV, | Civ. No. 3:11-cv-00429-AC |
| Plaintiff, | FINDINGS AND RECOMMENDATION |
| v. | |
| U.S. BANK NATIONAL ASSOCIATION ND, doing business as Elan Financial Services, EQUIFAX, INC., a Georgia Corporation, TRANSUNION LLC, a Delaware Limited Liability Company, EXPERIAN INFORMATION SOLUTIONS, INC., an Ohio Corporation, | |
| Defendants. | |

_____

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff Robert D. Boydstun, IV ("Boydstun") alleges two claims against Defendant Trans Union LLC ("Trans Union") under the provisions of the Fair Credit Reporting Act ("FCRA") that

govern the conduct of credit reporting agencies ("CRA"), 15 U.S.C. § 1681 *et seq.* Boydstun specifically alleges that Trans Union failed to employ reasonable procedures to maximize the accuracy of its report, failed to adequately reinvestigate disputed information, and failed to remove unverified information from its reports. Trans Union moved for summary judgment against Boydstun's claims, on the ground that the disputed information was accurate, its reinvestigation was adequate, there is no evidence of willfulness, and the creditor's failures in providing information preclude Trans Union's liability. The court, per its July 26, 2012, order (#107), restricts its consideration of this motion to the first two grounds, accuracy and reinvestigation. Disposition of the remaining grounds, if necessary, is deferred pending a final ruling on the present issues.

*Factual Background*

In 2007, West Coast Bank assisted Boydstun in opening a business credit account with U.S. Bank National Association ND ("U.S. Bank"),[1] for the use of his business, Boydstun Metal Works, Inc. (Trans Union Memorandum (#90) ("TU Memo."), Ex. A at 3.) The parties dispute whether Boydstun agreed to be personally liable for charges on the account. On November 10, 2007, U.S. Bank sent a notice to Boydstun regarding the credit card. The notice stated that the card would be sent to Boydstun's business address, per his request. The letter also notified Boydstun: "By activating and using your West Coast Bank Credit Card, you agree to accept the terms and credit limit assigned to the account." (Reger Declaration ("Decl.", Exhibit ("Ex.") 5 at 6.)

In 2009, Boydstun Metal Works "filed for bankruptcy and ceased operations." (TU Memo., Ex. B at 4.) Some time after filing, U.S. Bank contacted Boydstun regarding the business credit

---

[1] The card was issued by Elan Financial Services, a trade name for U.S. Bank. The court will hereinafter refer to Elan Financial Services as "U.S. Bank."

FINDINGS AND RECOMMENDATION        2                                    {KPR}

account. According to U.S. Bank, Boydstun was personally liable for the charges to that account. Boydstun informed U.S. Bank that the debt was corporate and referred it to the bankruptcy trustee. Nonetheless, U.S. Bank maintained that Boydstun was personally liable and continued to contact him in attempts to collect the debt. (Reger Decl., Ex. 2 at 5.)

I.      Communications with U.S. Bank

In a letter dated March 10, 2010, Boydstun's attorney contacted U.S. Bank Cardmember Services to again dispute his personal liability with respect to the business credit account. He described Boydstun's attempts to obtain documentation reflecting his agreement to be personally liable on the account and U.S. Bank's failure to provide documentation, except for "a copy of a letter purportedly sent to Mr. Boydstun's home with a copy of [the] Cardmember Agreement, and a copy of an account statement showing that certain charges were made to the account and attributed to Mr. Boydstun" and one of his employees. (Reger Decl., Ex. 2 at 6.) Boydstun's attorney threatened to sue U.S. Bank for various legal violations if it failed to either provide documentation of the credit agreement or cease collection efforts of the disputed debt.

Boydstun's attorney again contacted U.S. Bank by telephone on March 16, 2010, and U.S. Bank thereafter faxed a copy of the terms and conditions purportedly associated with Boydstun's credit account. Boydstun's attorney then authored a letter to U.S. Bank, arguing that the terms and conditions were dated 2010 and had been printed that day. He wrote: "Although you appear to be asserting that Mr. Boydstun agreed to these terms, there is clearly no way he could have agreed to terms in effect today. More importantly, even if these terms have not changed since 2007, you still have not provided any evidence to support you[r] assertion that Mr. Boydstun ever agreed to them." (Reger Decl., Ex. 2 at 7.) He next argued that the terms of the faxed agreement provide that credit

FINDINGS AND RECOMMENDATION        3                                          {KPR}

cards of that type require a signed application and, therefore, he could not have applied for the credit card in question online and "[t]here must, therefore, be a signed credit application on file somewhere." *Id.* On April 21, 2010, U.S. Bank responded by letter letter restating Boydstun's individual liability. Included with the letter was a copy of the "cardmember agreement and disclosure statement" purportedly associated with the account. (TU Memo., Ex. H at 3.)[2]

Boydstun's attorney again wrote to U.S. Bank, on April 28, 2010, reiterating Boydstun's position that the debt had not been verified and stating that, were it verified, Boydstun would pay the debt. (Reger Decl., Ex. 2 at 3.) U.S. Bank maintains, in its interrogatory responses, that Boydstun is personally liable on the card and that "U.S. Bank has an electronic record of the information plaintiff provided to it, which includes the software program edit that confirms that the applicant read and agreed to the terms of the cardholder agreement." (TU Memo., Ex. C at 3.)

Boydstun filed a complaint against U.S. Bank with the Oregon Department of Justice. U.S. Bank responded to this complaint on July 29, 2010, by letter. U.S. Bank stated that it had sent a copy of the "Cardmember Agreement" to Boydstun and enclosed "a copy of your Visa Business Card Cardholder Agreement similar to the one that was sent to you at the time you received the actual plastic credit card in November 2007 and identical to the one sent to [your attorney]." (Reger Decl., Ex. 5 at 8.)

II.     Communications with Trans Union

On July 4, 2010, Boydstun contacted Trans Union via online request seeking a consumer credit report. The report, dated that same day, showed under "Adverse Accounts" a business credit

---

[2] The letter states that "monthly statements" were also included, but Trans Union has not included those statements with the exhibit.

FINDINGS AND RECOMMENDATION     4                              {KPR}

card issued by U.S. Bank. (Reger Decl., Ex. 1 at 4.) The report disclosed a balance of $10,631, that the balance had been discharged and written off as a loss, and that the account had been opened in November 2007 and closed in April 2010. The report also advised Boydstun how to initiate an investigation into a disputed item.

In a letter to Trans Union dated July 6, 2010, Boydstun disputed the accuracy of the report, specifically the credit account with U.S. Bank. He explained that he had not intended to incur personal liability for this account, that he had repeatedly asked U.S. Bank to produce a signed agreement evidencing his personal guarantee of this debt, and that "[d]espite [his] repeated requests, [U.S. Bank] ha[d] failed to produce such a document." (Reger Decl., Ex. 2 at 2.) Boydstun requested that Trans Union verify this information and, absent verification, remove the information from his credit report. Boydstun attached correspondence between himself and U.S. Bank Cardmember Services. His attorney wrote that Boydstun disputed the debt but that "if, in fact, Mr. Boydstun agreed to these terms, he will pay the debt." (Reger Decl., Ex. 2 at 3.)

On July 17, 2010, Trans Union submitted an Automated Consumer Dispute Verification ("ACDV") to U.S. Bank, notifying it that Boydstun disputed his liability on the account. (Reger Decl. ¶ 54.) "U.S. Bank responded to the ACDV by updating the date the Account was closed to March 2010, the balance of the Account to $10,700 and the date the Account information was verified to July 2010." (Reger Decl. ¶ 55.) Trans Union reported the results of the verification to Boydstun, indicating that U.S. Bank had verified his individual liability. (Reger Decl. ¶ 56.) Trans Union also notified Boydstun that he could submit a consumer statement for attachment to his credit report, but Boydstun did not do so. (Reger Decl. ¶ 57.)

Boydstun responded to Trans Union by letter on October 19, 2010, wherein he expressed his

concern that Trans Union had not adequately investigated the veracity of the information furnished to Trans Union by U.S. Bank. (Reger Decl., Ex. 5 at 1.) Boydstun stated that U.S. Bank had never produced "a signed application, personal guarantee, or any other document that would support its claim." *Id*. at 2. He asked Trans Union to reinvestigate his claim. In conclusion, he wrote: "You are obligated by law to remove this information from my credit report because it cannot be verified. If you truly believe it can be verified, please let me know the basis of that belief. If not, please correct my credit report immediately." *Id*. at 4.

In November 2010, Trans Union again submitted an ACDV to U.S. Bank with regards to Boydstun's dispute. (Reger Decl., Ex. 6 at 2.) In an explanation of its investigation, Trans Union sent a letter to Boydstun, again stating that it had verified Boydstun's account with U.S. Bank and there was no change. (Reger Decl., Ex. 7 at 2.)

### III. Credit Account Documents

Trans Union submitted the affidavit of Maureen Flanagan, Senior Corporate Counsel of West Coast Bank, with four documents attached, the veracity of which Flanagan certifies. (TU Memo., Ex. D.) The first is a credit card application with the fields under "Business Information," "Business Owner Applicant Information," and "Individual Employee Information" filled in with information related to Boydstun Metal Works, Boydstun, and Laurie Weinsoft ("Weinsoft"), respectively. The document is signed by both Boydstun and Weinsoft, but neither signature is dated. The document contains a section wherein the applicant chooses the specific credit card sought by making a check in the box next to the credit card listed, and no mark is made in this section to indicate the desired card. The terms of the application state that "the Business Owner is individually liable and jointly liable with the Business for all charges made on the account." (TU Memo., Ex.

D at 5.)

The second document, dated November 19, 2007, is an email between employees of West Coast Bank and U.S. Bank that refers, presumably, to the "Business Card Authorized Person(s)" and "Visa Business Card Company Profile" forms that follow. (TU Memo., Ex. D at 6.) The authorized persons form permits Weinsoft to "make modifications to existing cardholder(s) account, change credit limits, and add new cardholders for the Company named below." (TU Memo, Ex. D at 7.) It names "Boydstun Metal Works" and is signed by Weinsoft. The document is also signed and dated by Boydstun. It contains a line for "Account Number," but this line is blank.

The final document, the "Visa Business Card Company Profile" form, identifies Boydstun Metal Works as the business in question, and Boydstun as the "individual who originally applied for [the] Company's Business Card." (TU Memo., Ex. D at 8.) It reiterates that Boydstun "agree[s] to be jointly and severally liable, as principal and not as surety or guarantor, to repay any and all transactions charged to any and all Accounts, plus interest and other charges, according to the terms of the Visa Business Cardmember Agreement[.]" *Id*. At deposition, Boydstun admitted that the signatures on these documents appeared to be his, though he did not admit to actually signing the documents or recall signing them. (TU Memo., Ex. F at 3; Ex. A at 6-7.)

In the course of discovery in this lawsuit, U.S. Bank admitted that it had "not yet located a signed credit application for the above referenced account, but ha[d] verified that there was an electronically signed application and a paper cardholder agreement." (Boydstun Decl., Ex. 9 at 2.) Trans Union, in response to a request for admission that it lacked evidence that a signed credit application exists, admitted: "Trans Union states that it has made a reasonable inquiry and the information it knows or can readily obtain is insufficient to enable it to admit or deny this Request."

(Boydstund Decl., Ex. 10 at 2.) It was not until approximately nine months after this suit was filed, in October 2011, that any evidence of Boydstun's credit application was located and produced.

At deposition, Tamara Lockridge, an agency specialist with U.S. Bank, testified that when the credit card is mailed to the user, it is accompanied by terms and conditions and the user is informed that its use binds the user to the terms and conditions. Lockridge stated that Boydstun's file contains no indication that he contacted U.S. Bank after receiving the card to object to its existence or terms and conditions, and so its use "was enough to determine liability." (TU Memo., Ex. I at 4-5.)

*Legal Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2011). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a *genuine* issue for trial." FED. R. CIV. P. 56(e) (2008) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

## *Discussion*

The court's inquiry here is limited to two issues. The court must determine if genuine issues of material fact exist regarding whether Trans Union reported accurate and complete information, and whether Trans Union conducted a reasonable investigation into the accuracy of information reported by U.S. Bank. The court will address each issue in turn.

I.     Accuracy

Whether the disputed information contained in a credit report is accurate and complete is a threshold determination for claims arising under the reinvestigation provision of the FCRA (or "section § 1681i"). *Carvalho v. Equifax Information Services, LLC*, 629 F.3d 876, 890 (9th Cir. 2010). The plaintiff seeking to assert a claim under the FCRA bears the burden of proving the report's deficiency. *Guimond v. Trans Union Credit Information Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (citing *Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991)).

"An item on a credit report is considered 'incomplete or inaccurate' under the FCRA if 'it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions.'" *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1071 (D. Or. 2011) (quoting *Gorman v. Walpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009)).

Trans Union argues that an accurate report is a complete defense to Boydstun's claim and that Boydstun has failed to present evidence that raises a question of fact regarding accuracy. Instead, Trans Union contends, Boydstun has responded to documentary evidence by repeatedly changing his position to conform to the evidence presented. Trans Union cites the signed application form, the authorized persons form, and the company profile form as documentary evidence of Boydstun's personal liability. According to Trans Union, Boydstun does not dispute that the signatures "appear" to be his signature.

Trans Union also argues that use of a credit card binds the user to the terms and conditions associated with that card. In *Citibank South Dakota N.A. v. Santoro*, 150 P.3d 429, 210 Or. App. 344 (2006), the plaintiff, Santoro, claimed that he was not liable for a credit card with which he had accrued charges, despite the fact that he admitted he had received the terms and conditions and used the credit card. Santoro claimed that he was not bound by the terms and conditions simply because he did not sign the credit card agreement. The Oregon Court of Appeals disagreed, observing that parties can manifest their assent to an agreement by way of conduct. It wrote: "In this case, Santoro does not dispute that he received the credit card at his request, that he did not cancel the credit card account, and that he used the credit card. We conclude that his conduct constituted an acceptance of the agreement." *Id*. at 349. Thus, Trans Union argues, Boydstun's receipt and use of the card is

action that amounts to an agreement to be bound by the terms and conditions associated with the card. According to Trans Union, Boydstun does not dispute the terms of the agreement, that use of the card binds him to those terms, or that he actually used the card and incurred the charges.

Boydstun presents no genuine issue of material fact regarding accuracy. First, in his briefing on summary judgment, Boydstun failed to present evidence to controvert Trans Union's showing that he is, in fact, personally liable on the debt. He does not dispute that the signature on the credit application is his and the terms and conditions make clear that the individual to whom the card is issued is jointly liable with the business for charges incurred on that credit card. Furthermore, per the card's terms and conditions, use of the card binds the user to the terms and conditions that govern the card in question. Accordingly, Trans Union has produced evidence sufficient to establish Boydstun's individual liability on the card and, on the record before the court, this liability has not been undermined or disproved by Boydstun. Second, this issue was conceded at oral argument and the technical accuracy of the debt is no longer disputed.

Having conceded technical accuracy, Boydstun argues that Trans Union's delayed verification of Boydstun's debt is in violation of the FCRA, which requires reinvestigation where the debt is disputed with respect to its completeness or accuracy. Trans Union argues that the accuracy of a debt as reported is a complete bar to liability under the FCRA. In arguing that the debt's accuracy is an unassailable threshold requirement to an FCRA reinvestigation claim, Trans Union relies heavily on the Ninth Circuit's opinion in *Carvalho*. In *Carvalho*, the court evaluated a claim under a California state statute, California's Consumer Credit Reporting Agencies Act ("CCRAA"). The CCRAA is "'substantially based on the Federal Fair Credit Reporting Act'" such that "'judicial interpretation of the federal provisions is persuasive authority and entitled to

substantial weight when interpreting the California provisions.'" 629 F.3d at 889 (quoting *Olson v. Six Rivers National Bank*, 111 Ca. App. 4th 1, 3 Cal. Rptr. 3d 301, 309 (2003)). In that context, the court discussed application of the FCRA.

First, the Ninth Circuit observed that "[a]lthough the FCRA's reinvestigation provision, 15 U.S.C. § 1681i, does not on its face require that an actual inaccuracy exist for a plaintiff to state a claim, many courts, including our own, have imposed such a requirement. . . . We conclude that unless Carvalho has raised a genuine issue as to whether the disputed item was inaccurate, her CCRAA section 1785.16 claims fail as a matter of law." *Id*. at 890. The court thus appeared to state a general and unequivocal rule regarding accuracy. The court's subsequent discussion, however, moves away from this categorical rule.

The *Carvalho* court referenced its decision in *Gorman*, wherein it reasoned that "a credit entry can be 'incomplete or inaccurate' within the meaning of the FCRA 'because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions.'" *Id*. at 890 (quoting *Gorman*, 584 F.3d at 1163). It noted that California courts have outlined a similar approach with respect to accuracy, quoting the California Court of Appeal that "a report violates the[se] statutes when it is misleading or incomplete, even if it is technically accurate." *Cisneros v. U.D. Registry, Inc.*, 39 Cal. App. 4th 548, 46 Cal. Rptr. 3d 233, 254 (1995). The court concluded: "Accordingly, in considering whether Carvalho's credit report was inaccurate within the meaning of the CCRAA, we are guided by *Gorman*'s "patently incorrect or materially misleading" standard. The Ninth Circuit thereby allowed that a technically accurate report may not be immune from a reinvestigation claim under the FCRA.

Thus, to give full effect to both Ninth Circuit precedent and the statute itself, a court must

consider whether a CRA's report is patently incorrect *or* misleading, rather than simply incorrect in the technical sense. The Ninth Circuit provided some guidance in *Gorman*, stating that a claim for inaccurate or incomplete reporting may arise where "it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." 584 F.3d at 1163. Thus, subsequent verification, regardless of when that verification occurs, does not cure a report which, in the interim, is misleading in such a way as to adversely affect credit decisions regarding the particular consumer.

Here, Trans Union listed a debt on Boydstun's credit report that, at the time in question, was neither verified nor verifiable and Boydstun has presented evidence that had the debt been verified by Trans Union, he would have paid the debt. It is undisputed that Trans Union was on notice of the nature of Boydstun's dispute with U.S. Bank, specifically that U.S. Bank had repeatedly failed to produce documentation of the credit account and the underlying debt. Trans Union's continued reporting of Boydstun's debt to U.S. Bank implied that it was both accurate and verified. The report also misrepresented Boydstun's actual creditworthiness – not because Boydstun was unable to pay, but precisely because he was able and willing to pay upon reinvestigation and verification of the debt. Accordingly, there is at least a genuine issue of material fact regarding the completeness of Trans Union's report.

Trans Union argues that the report was neither inaccurate nor misleading because the necessary documentation of the debt was unearthed in the course of this litigation. Trans Union's position would render meaningless the reinvestigation provision of the FCRA, in particular its requirement that CRAs perform a reasonable reinvestigation within thirty days of a dispute. Under Trans Union's formulation, where the report of the underlying debt ultimately proves accurate, the

FINDINGS AND RECOMMENDATION    13    {KPR}

CRA could not be held liable even where it failed to take any action at all to reinvestigate a disputed debt, regardless of the length of time required to establish its accuracy. This position is at odds with a fundamental canon of statutory construction, that a statute should be interpreted so as to give effect to all of its language. *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1062 (9th Cir. 2003) (citing *Tabor v. Ulloa*, 323 F.2d 823, 824 (9th Cir. 1963)).

Additionally, the facts in *Carvalho* are distinguishable from the facts of the present case. In *Carvalho*, the plaintiff conceded that the data contained in the credit report was accurate on its face, but argued that it was misleading because the debt was not legally owed until the creditor had properly billed her insurer. 629 F.3d at 891. The court found this argument wanting:

> The fundamental flaw in Carvalho's conception of the reinvestigation duty is that credit reporting agencies are not tribunals. They simply collect and report information furnished by others. Because CRAs are ill equipped to adjudicate contract disputes, courts have been loath to allow consumers to mount collateral attacks on the legal validity of their debts in the guise of FCRA reinvestigation claims.

*Id*. (citing *Saunders v. Branch Banking & Trust Co. of Virginia*, 526 F.3d 142, 150 (4th Cir. 2008)). Thus, the dispute between Carvalho and the CRA hinged on a legal coverage issue between Carvalho and her insurer, and the debt was otherwise verifiable and accurate. Here, however, the dispute arises from Trans Union's inability to verify the debt, despite the debt's accuracy. Although Boydstun has an underlying legal dispute with U.S. Bank, Boydstun did not ask Trans Union to resolve this dispute and his claim against Trans Union is independent of that dispute. Rather, Boydstun's claim against Trans Union arises from its inability to verify the debt and, perhaps more importantly, its failure to take reasonable steps to uncover the unverifiable nature of the debt.

Trans Union would have the court draw an absolute boundary between accuracy and reinvestigation, but the plain language of the statue suggests otherwise. The statute imposes a thirty-

day period in which the CRA must conduct a reasonable investigation of the disputed debt. Permitting a CRA to ignore its duty under the law in the event the debt proves accurate would be a serious impediment to achieving the stated purpose of the FCRA. "The legislative history of the FCRA reveals that it was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner. These consumer oriented objectives support a liberal construction of the FCRA." *Guimond v. Trans Union Credit Info., Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (internal citations omitted). Although accuracy is critical to most claims under the FCRA, its liberal construction also permits claims where an incomplete report of a technically accurate debt is "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." 584 F.3d at 1163. In this case, Boydstun has raised a genuine issue of material fact as to whether the information on his Trans Union credit report was incomplete.

II.     Reasonable Reinvestigation

Under section 1681i, a CRA must reinvestigate "any information contained in a consumer's file" if notified directly by the consumer who is the subject of the credit report. 15 U.S.C. § 1681i(a)(1)(A) (2012). Upon such notice, the CRA must "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file" consistent with the further provisions of the statute. *Id*. In doing so, the CRA must "review and consider all relevant information submitted by the consumer, promptly provide the credit grantor of the disputed item with all relevant information regarding the dispute, and then promptly delete or modify the item based on the results of the reinvestigation." *Bradshaw*, 816 F. Supp. 2d at 1073 (citing 15 U.S.C. § 1681i(a)(2)(B), (4), (5)(A)

(2012)). A reinvestigation is deemed insufficient where the CRA "could have unconvered the inaccuracies 'if it had reasonably reinvestigated the matter.'" *Id*. (quoting *DeAndrade v. Trans Union LLC*, 523 F.3d 61, 68 (3d Cir. 2008)). And, as this court has held previously, it is not sufficient merely to seek automated verification from the creditor, via an ACDV, without further investigation. *See Saenz v. Trans Union, LLC*, 621 F. Supp. 2d 1074, 1082-1084 (D. Or. 2007) (surveying relevant case law and concluding that "as a matter of law, Trans Union's exclusive reliance on automated data-matching procedures" did not "satisf[y] its several reasonable reinvestigation obligations.").

In response to both the initial dispute regarding the credit account and Boydstun's request for reinvestigation, Trans Union issued an ACDV to U.S. Bank, U.S. Bank verified Boydstun's individual liability, and Trans Union communicated the verification to Boydstun. Thus, Trans Union relied exclusively on ACDVs in its initial inquiry and the reinvestigation. Under Ninth Circuit law, it is insufficient to rely exclusively on automated verification from the creditor and, accordingly, Trans Union's reinvestigation was not reasonable.

*Conclusion*

For the reasons stated, Trans Union's motion for summary judgment (#89) should be denied.

*Scheduling Order*

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due June 20, 2013. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and

Recommendation will go under advisement.

DATED this 6th day of June, 2013.

/s/ John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge
